IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| MAHASKA PORK, L.P.,<br><br>     Plaintiff,<br><br>vs.<br><br>TRAVELERS INDEMNITY COMPANY<br>OF AMERICA,<br><br>     Defendant. | No. 4:09-cv-00302 – JEG<br><br>**O R D E R** |

This matter comes before the Court on Motion for Summary Judgment brought by Defendant Travelers Indemnity Company of America (Travelers), which Plaintiff Mahaska Pork, L.P. (Mahaska) resists. The Court held a hearing on the motion on January 19, 2011. Attorney Richard A. Buchanan represented Travelers. Attorney Rachel Rowley represented Mahaska. The matter is fully submitted and ready for disposition.

## I.     BACKGROUND[1]

---

[1] On October 25, 2010, Travelers filed its Motion for Summary Judgment, and on that same day, counsel for Travelers certified that counsel for Mahaska was electronically served. Thereafter, Mahaska failed to expressly admit, deny, or qualify each of Travelers' numbered statements of undisputed material fact within 21 days after service of the motion. See LR 56.b ("A party resisting a motion for summary judgment must, within 21 days after service of the motion, file . . . [a] response to the statement of material facts in which the resisting party expressly admits, denies, or qualifies each of the moving party's numbered statements of fact, filed as an electronic attachment to the brief under the same docket entry."). The failure to respond to a statement of material fact operates as an admission of that fact. See LR 56.d. On December 10, 2010, counsel for Mahaska filed a Motion for Leave to File Response to Defendant's Undisputed Statement of Facts. Travelers resisted Mahaska's motion and argued that Travelers would be prejudiced if the Court allowed Mahaska to file a late response because Travelers "crafted its Reply Brief under the legitimate assumption that its Statement of Facts was undisputed." Def.'s Resp. to Pl.'s Mot. for Leave to File Resp. to Def.'S SUF at 3, ECF No. 35. In its motion, Mahaska indicated that it "does not dispute any of Travelers' statements of disputed material fact (except for its conclusory statements that clearly misquote Mahaska's experts' opinions and testimony); rather the disputed facts which make summary judgment improper in this case are found in Mahaska's Statement of Disputed Facts." Pl.'s Mot. for Leave to File Resp. to Def.'s SUF at 1-2, ECF No. 33. As such, Mahaska has indicated that it only objects to paragraphs nine and twelve of Travelers' statement of undisputed facts, which Mahaska argues wrongly purport to interpret the opinions of Mahaska's experts as favorable to

The facts of this case are either not in dispute or are viewed in the light most favorable to Mahaska, the non-moving party. See Baye v. Diocese of Rapid City, 630 F.3d 757, 759 (8th Cir. 2011).

Mahaska owns buildings used to house and furnish care for hogs. Travelers provided property and liability insurance to Mahaska pursuant to insurance policy No. 700-7848C504-TIA-08 (the Policy) for Mahaska's hog building near Barnes City, Iowa (the Building). The building is a one-story structure that is approximately 75 feet wide, 380 feet long, and is orientated lengthwise along a north-south plane. The building houses sows, which live on slotted, precast concrete sections that comprise the first floor of the building. The sows' waste product flows from the first floor down into a concrete manure pit (the pit) below the first floor. The pit is divided by three concrete divider walls into four 95-foot long compartments. The divider walls between the pit's compartments each contain openings (equalizer openings) that are designed to allow manure to flow through from one compartment to the next so that the relative depth of manure remains equal in each compartment throughout the building.

On November 18, 2008, a contractor pumped manure out of one of the four compartments.[2] Prior to pumping the manure, the contractor "jetted" the waste material in the pit in an

_____

Travelers' legal argument. Independent of Mahaska's motion, the Court maintains a duty to ensure that each statement of undisputed fact is supported by the Record supplied to the Court. The Court finds that Travelers' statements of undisputed fact are admitted to the degree that they are supported by the Record and do not constitute argumentative interpretations of expert testimony. Mahaska's Motion for Leave to File Response to Defendant's Undisputed Statement of Facts is denied as moot. See Smith v. Insley's Inc., 499 F.3d 875, 879 (8th Cir. 2007) (noting that the Court has "broad discretion to set filing deadlines and enforce (or not enforce) local rules" (citation omitted)).

[2] Mahaska used the manure collected in the pit of the building to fertilize its own fields, and to sell as fertilizer to third-parties. Travelers does not dispute that the manure constitutes personal property as defined under the policy.

attempt to mix the solid and liquid waste together into one homogeneous solution. However, the equalizer openings had become clogged and prevented the manure from flowing between compartments. Due to the inability of the manure to flow properly, the volume of manure in the two southernmost compartments became unequal after the pumping occurred. On November 19, 2008, the divider wall between the two southernmost compartments collapsed and struck the first floor's support pillars, which in turn caused part of the first floor to cave in. Mahaska submitted a claim to Travelers; and, following an investigation, Travelers denied Mahaska's claim on April 1, 2009.

On June 15, 2009, Mahaska filed this action in Mahaska County, Iowa, seeking a declaratory judgment that the collapse is a covered peril under the Policy (Count I) and alleging that Travelers breached its contract with Mahaska by failing to compensate Mahaska for the loss (Count II). Mahaska seeks damages "for the physical loss and damages to the building, for Mahaska's lost business income and extra expenses incurred as a result of the collapse, and for [Mahaska's] investigation of the collapse." First Am. Compl. ¶ 23, ECF No. 13. Travelers filed a notice of removal to this Court on August 2, 2009. Removal was proper pursuant to 28 U.S.C. §§ 1332 and 1441. On October 25, 2010, Travelers moved for summary judgment. Mahaska timely resisted.

## II.   DISCUSSION

### A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing that

there are no genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986). Then, "[i]n order to create an issue for trial the nonmoving party must produce sufficient

evidence to support a verdict in his favor based on more than 'speculation, conjecture, or

fantasy.'" Doe v. Dep't of Vet. Affairs, 519 F.3d 456, 460 (8th Cir. 2008) (quoting Putman v.

Unity Health Sys., 348 F.3d 732, 733-34 (8th Cir. 2003)). Summary judgment must be entered

"against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial."

Celotex, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably

find for the plaintiff." Anderson, 477 U.S. at 252.

### B. Relevant Policy Provisions[3]

In this case, the Policy includes a general exclusion of coverage for losses caused by

collapse:

> **D. Covered Causes of Loss – Special**
> Subject to the provisions of Section **A.**, when Special is shown in the
> Declaration, Covered Causes of Loss means Risks Of Direct Physical
> Loss unless the loss is excluded in the following paragraphs or in Section
> **E.** Exclusions.
>
> 1. We will not pay for loss or damage caused by or resulting from:
> . . .
>     b. Collapse, except as provided in the Additional Coverage entitled
>      Collapse. But if collapse results in a Covered Cause of Loss at the
>      "insured location", we will pay for the loss or damage caused by
>      that Covered Cause of Loss.

---

[3] The parties do not dispute that Iowa law applies to the substantive claims in this diversity
action, arguing the issues from that perspective.

The Policy, Def.'s App. 64, ECF No. 29-4. Under "Additional Coverages", "Collapse", the

Policy then provides a number of exceptions to the general exclusion of coverage for collapse:

> **5. Collapse**
> The following Additional Coverage applies when Broad or Special
> Covered Causes of Loss is specified in the Declaration:
> a. We will pay for direct physical loss or damage to Covered Property,
> caused by collapse of a building or any part of a building insured
> under a Farm Property Coverage Form, if the collapse is caused by
> one or more of the following:
> (1) The "specified causes of loss" or breakage of building glass, all
> only as insured against in this Coverage Part;
> (2) Hidden decay;
> (3) Hidden insect or vermin damage;
> (4) Weight of people or personal property;
> (5) Weight of rain that collects on a roof;
> (6) Use of defective material or methods in construction, remodeling
> or renovation if the collapse occurs during the course of the con-
> struction, remodeling or renovation. However, if the collapse
> occurs after construction, remodeling or renovation is complete
> and is caused in part by a cause of loss listed in **5.a.(1)** through
> **5.a.(5)**, we will pay for the loss or damage even if use of defective
> material or methods, in construction, remodeling or renovation,
> contributes to the collapse.
> b. With respect to the following property:
> (1) Foundations and retaining walls;
> (2) Underground pipes, flues and drains;
> (3) Cesspools and septic tanks;
> (4) Walks, roadways, patios and other paved surfaces;
> (5) Awnings;
> (6) Fences;
> (7) Outdoor equipment including yard fixtures;
> (8) Swimming pools; and
> (9) Bulkheads, docks, piers and wharves;
> if the collapse is caused by a cause of loss listed in **5.a.(2)** through
> **5.a.(6)**, we will pay for loss or damage to that property only if:
> (1) Such loss or damage is a direct result of the collapse of a building
> insured under a Farm Property Coverage Form; and
> (2) The property is Covered Property under a Farm Property
> Coverage Form.

Id. at 54-55. With regard to design defects, the Policy states that:

2. [Travelers] will not pay for loss or damage caused by or resulting from any of the following, **2.a.** through **2.c.**  But if an excluded cause of loss that is listed in **2.a.** through **2.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

. . .

    c.  Faulty, inadequate or defective:
       (1) Planning, zoning, development, surveying, siting;
       (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
       (3) Materials used in repair, construction, renovation or remodeling; or
       (4) Maintenance;
       of part or all of any property on or off the "insured location".

Id. at 67.

Travelers argues that summary judgment is appropriate because (1) the weight of personal property did not cause the collapse because weight is a vector force that always acts downward toward the center of the earth and therefore could not have contributed to the lateral pressure that forced the divider wall to collapse; (2) Mahaska has presented insufficient evidence that hidden decay caused the collapse; and (3) Mahaska only alleges that the weight of personal property and hidden decay caused the collapse because design defects contributed to the collapse.

### 1. Weight of Personal Property

Travelers first argues that the words "weight . . . of personal property" are not defined within the policy, and therefore the words should be given their ordinary meaning.  Travelers defines weight as "the amount of quantity of heaviness or mass; the amount a thing weighs. 2. Physics.  The force which gravitation exerts upon a body, equal to the mass of the body times the local acceleration of gravity."  Def.'s Br. 9, ECF No. 29-1 (citation omitted).  Further, Travelers argues that all of the experts retained by both Travelers and Mahaska agree that lateral pressure, not the weight of personal property, caused the collapse.  Thus, Travelers contends, it is entitled to summary judgment because unequal depths of manure created unequal pressure on the

divider wall, causing it to collapse, and that "unequal pressure on the sides of a [divider] wall is not one of the specifically enumerated causes of loss for which the [P]olicy provides collapse coverage." Id. at 3. Mahaska contends there are disputes of fact regarding whether the collapse was caused by the weight of personal property, and therefore the Court should deny Travelers' Motion for Summary Judgment.

"The construction of an insurance policy is the process of determining the policy's legal effect; interpretation is the process of determining the meaning of the words used in the policy." Thomas v. Progressive Cas. Ins. Co., 749 N.W.2d 678, 681 (Iowa 2008). "When no extrinsic evidence is offered on the meaning of language in a policy, 'the interpretation and construction of an insurance policy are questions of law for the court.'" Farm Bureau Life Ins. Co. v. Chubb Custom Ins. Co., 780 N.W.2d 735, 739 (Iowa 2010) (quoting Lee v. Grinnell Mut. Reins. Co., 646 N.W.2d 403, 406 (Iowa 2002)). "In construing insurance contracts, we adhere to the rule 'that the intent of the parties must control.'" Swainston v. Am. Family Mut. Ins. Co., 774 N.W.2d 478, 481 (Iowa 2009) (quoting A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am., 475 N.W.2d 607, 618 (Iowa 1991)). "Except in cases of ambiguity, the intent of the parties is deter-mined by what the policy says." Id.

"The test for ambiguity is an objective one: Is the language fairly susceptible to two inter-pretations?" Thomas, 749 N.W.2d at 681 (quoting Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents, 471 N.W.2d 859, 863 (Iowa 1991)). "Only when the policy language is susceptible to two reasonable interpretations do we find an ambiguity." Id. (quoting Kibbee v. State Farm Fire & Cas. Co., 525 N.W.2d 866, 868 (Iowa 1994)). In interpreting the insurance contract, the Policy is to be read as a whole, and the Court will not strain words or phrases in order to find liability where none was intended to exist. See id.

7

In this case, the Court need not engage in extensive interpretive gymnastics because the language of the Policy is unambiguous:  by its plain language, the Policy provides for recovery where the weight of personal property causes direct physical loss or damage to covered property. Indeed, Travelers does not contest that the Policy provides such coverage where the weight of personal property causes a collapse, but rather focuses its efforts on attempting to convince the Court that Mahaska will ultimately fail in proving its case.  Travelers' argument, at its core, is an effort to redefine what are at base factual questions – whether the weight of personal property created lateral pressure and whether the weight of personal property was a proximate cause of the collapse – as legal determinations that would be proper for this Court to resolve at the summary judgment stage.  However, as the record reveals, genuine factual disputes exist among the opinions of the experts retained by both parties.

Travelers designated expert witnesses Ernest A. Rogalla, S.E. (Rogalla) and Charles Chancey, Ph.D. (Dr. Chancey) and Mahaska designated expert witnesses James Tometich, P.E. (Tometich) and Dwaine S. Bundy, Ph.D., P.E. (Dr. Bundy).  A review of the various experts' reports demonstrates that while those experts who proffered an opinion as to the cause of the collapse agree that lateral pressure forced the divider wall to fail, there is disagreement as to what effect the weight of manure had on the creation of lateral pressure.

After completing an investigation of the building, Rogalla opined that the failure to re-suspend all of the solid waste at the bottom of the pit could have led to the equalizer holes becoming clogged and that "[w]hen the openings in the bottom of the [divider] walls become clogged, pumping one compartment area can create uneven waste levels across the [divider] walls."  Rogalla Report, Def.'s App. 111, ECF No. 29-6.  Rogalla calculated that a difference of 1.4 feet of waste depth on either side of the divider wall would have been enough to make the

8

wall-slab connection fail, causing the wall to become unstable and to collapse, and

concluded that

> Pumping during the day and night before the collapse probably created uneven
> waste depths in the two pit compartments within the collapse area, creating
> unbalanced pressures against the [divider] wall between them. The resulting
> overturning pressures against the wall overloaded the base connection of the
> wall to the slab, causing the wall to overturn and slide. The collapsing wall
> struck the nearby masonry columns north of the wall, knocking the columns
> over and felling the beams and floor slats immediately above.

Id. at 112.

Dr. Chancey testified that "[t]he primary cause of the wall failure was from the unequal

pressures of the liquid manure on the two sides of the divider wall." Chancey Dep., Def.'s App.

218, ECF No. 31-5. However, Dr. Chancey agreed that if the manure had no weight, lateral

pressure would not have been exerted against the divider wall. Dr. Chancey commented that if

gravity did not apply, and thus objects on Earth were weightless, "assuming you put Saran Wrap

over the top [of the manure pit] and kept [the manure in], yes, by turning off gravity, you will

start a chain reaction that takes away pressure." Id.

With regard to the relationship between pressure and weight, Dr. Bundy admitted that

weight is a vector force that acts downward. However, Dr. Bundy explained that weight impacts

the design of the divider wall's strength. See Bundy Dep., Def.'s App. 191, ECF No. 29-4 ("As

an example, if something only weighs half as much, I will design my wall differently than if it's

the same, you know, weight of water."). Dr. Bundy remarked that

> weight is a very key factor, and we have to use that for designing purposes. And
> we cannot get away from weight that we use to design a horizontal force.
> Everything else that's utilizing all these terminologies is contrary to what the
> engineering principles that we've been through today in terms of a definition for
> an engineering design of a manure pit.

Id. at 192. Ultimately, Dr. Bundy concluded that the "[t]he primary cause of the wall failure was from the unequal weight of the liquid manure on the two sides of the divider wall." Bundy Report, Pl.'s App. Ex. 2, ECF No. 30-6.[4]

Finally, Tometich investigated the building and concluded that "[t]he wall collapsed due to the excessive hydraulic pressure caused by the weight of the manure," and that "[t]here were numerous items which contributed to the collapse, including improper design, defective materials and methods of construction and hidden decay." Tometich Report, Pl.'s App. Ex. 2, ECF No. 30-6. Tometich testified that "[w]eight technically is mass times acceleration due to gravity. It's the force per given area downward toward the center of the earth that a body imposes on any given surface." Tometich Dep., Def.'s App. 198, ECF No. 29-10. Tometich also explained how weight creates pressure:

> [A]ny time you have weight above any surface, it will put pressure on that surface. If it's a fluid, it will put three-dimensional pressure on that surface. For example, the weight of the water at the top of the swimming pool creates pressure at the bottom of the swimming pool. As you swim deeper, the pressure gets greater. That's because the depth – the weight of the water above. Similarly on a retaining wall, . . . , you have to take the weight of the manure times the height of the manure to find the pressure at the base of the wall.

Id. at 198. Tometich said that the weight of an aqueous substance like manure applies a force to retaining walls, noting that "[i]f you remove the walls, the weight created by the water above would allow the balance of the manure to flow out. [The weight above] applies the pressure to the walls." Id. at 202. Finally, when asked whether he would testify at trial that manure created weight against the divider walls, Tometich remarked, "No. Liquid Hog manure is weight, and it

---

[4] Mahaska failed to consecutively number the pages of its appendix as required by Local Rule 56.e. Therefore, the Court is unable to direct the reader to a specific page within Mahaska's appendix and instead guides the reader to an exhibit within Mahaska's appendix where the cited material can be found.

caused pressure. That's been what I've said in my report and what I've said throughout this deposition." Id. at 203.

While consensus exists among the experts that lateral pressure forced the divider wall to collapse, the experts disagree as to what effect weight had on the creation of lateral pressure. Dr. Bundy and Tometich specifically commented that the weight of the manure created the lateral pressure that caused the divider wall to collapse. Dr. Chauncey admitted that if the manure were weightless, lateral pressure would not have been exerted against the divider wall. Rogalla suggested that the unequal depth of the manure on either side of the divider wall created the difference in pressure. At the hearing, counsel for Travelers admitted that the question of whether weight causes lateral pressure is a highly disputed question among the experts retained in this case. Despite admitting the existence of this dispute, Travelers invites the Court to conclude that the height of manure, as opposed its weight, created the increased lateral pressure against the divider wall. However, because the Court cannot resolve factual disputes at this stage, this question must be left for the jury to resolve. Likewise, Travelers' argument that the experts' opinions that lateral pressure forced the collapse "should be the end of the analysis" also runs contrary to Iowa caselaw. The question of whether the weight of manure was a proximate cause of the collapse is one that must ultimately be determined by a jury, not by this Court on motion for summary judgment. See Clasing v. State Farm Fire & Cas. Co., No. 08-1237, 2009 WL 1492044, at *2-3 (Iowa Ct. App. May 29, 2009) (unpublished table decision) (noting that "[i]n insurance law it is generally understood that where the peril insured against sets other causes in motion which, in an unbroken sequence and connection between the act and final loss, produces the result for which recovery is sought, the insured peril is regarded as the proximate cause of the entire loss," Qualls v. Farm Bureau Mut. Ins. Co., 184 N.W.2d 710, 713 (Iowa

1971), and concluding that the district court erred in determining the question of causation because "[t]he question of proximate cause is ordinarily for the jury – only in exceptional cases should it be decided as a matter of law" (citing Clinkscales v. Nelson Securities, Inc., 697 N.W.2d 836, 841 (Iowa 2005))).

The Court finds that summary judgment must be denied because genuine issues of material fact exist as to whether the relative change in the weight of the manure between the two southernmost compartments created a variation of lateral pressure and whether weight was a proximate cause of the collapse. See Anderson, 477 U.S. at 248 ("[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."); Clasing, 2009 WL 1492044, at *3.

### 2. Hidden Decay

In its complaint, Mahaska asserted that hidden decay was one of the causes of the collapse. However Mahaska did not argue that hidden decay was a cause of the collapse in resisting Travelers' Motion for Summary Judgment. Further, counsel for Mahaska indicated at the hearing that Mahaska was abandoning its claim that hidden decay was a cause of the collapse. Therefore, summary judgment is appropriate on the hidden decay theory of causation. See Celotex, 477 U.S. at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

### 3. Design Defect

Finally, Travelers suggests that the Policy's exclusion for design defects, see supra p. 6, "is the real reason why Mahaska alleges a loss by 'hidden defect' and 'weight of personal property' when its experts clearly do not support its claim." Def.'s Br. 8, ECF No. 29-1. However, the

parties have not moved for summary judgment on Traveler's affirmative defense for design

defect. Therefore, the question of whether the Policy precludes recovery if a design defect is

determined to be a contributing factor to the collapse is not properly before the Court, and the

Court can make no finding on that issue.

## III.  CONCLUSION

For the reasons stated above, Travelers' Motion for Summary Judgment (ECF No. 29)

must be **granted in part** and **denied in part**.  The Motion is granted as to the hidden decay

theory of causation but denied as to the remainder.

**IT IS SO ORDERED.**

Dated this 12th day of April, 2011.

JAMES E. GRITZNER, JUDGE
UNITED STATES DISTRICT COURT